Juana SIERRA, Plaintiff,

v.

CITY OF NEW YORK; New York City Department of Buildings, and Patricia J. Lancaster, in her capacity as Commissioner of New York City Department of Buildings; New York City Department of Housing Preservation and Development, and Shaun Donovan, in his capacity as Commissioner of New York City Department of Housing and Development; and Emad Ibrahem, Defendants.

No. 07 Civ. 6769(JSR).

United States District Court, S.D. New York.

Oct. 1, 2008.

Molly Doherty Martha Ann Weithman, Goddard Riverside West Side SRO Law Project, Ami T. Sanghvi, Leslie T. Annexstein, New York, NY, for Plaintiff.

Jerald Horowitz, Jacqueline Hui, New York City Law Department, New York, NY, for Defendants.

## OPINION AND ORDER

JED S. RAKOFF, District Judge.

Section 27–2076(b) of the New York City Housing Maintenance Code ("HMC") prohibits families with children under the age of sixteen from residing in single room occupancy units ("SROs"), which are defined in turn as "rooming units" that lack either an in-unit kitchen or an in-unit bathroom. Plaintiff Juana Sierra, a mother of two children who formerly occupied two units of that type, has challenged the restriction under the Fair Housing Act ("FHA"), 42 U.S.C. § 3604(a), arguing that it impermissibly discriminates on the basis of family status. Sierra asks the Court to declare the ordinance invalid and enjoin its future enforcement, as well as to award her damages. The City defendants—the City of New York, the N.Y.C. Department of Buildings ("DOB") and its Commissioner, and the N.Y.C. Department of Housing Preservation and Development ("HPD") and its Commissioner—oppose Sierra's request, defending section 27–2076(b) as a valid means of ensuring the safety of City residents. Each party contends that its respective position best protects the interests of families and children.

This case has a long procedural history, which is described in detail in the Court's earlier Orders. *See* Order dated December 6, 2008 (dismissing some of Sierra's claims under the Anti–Injunction Act); Memorandum dated January 2, 2008 (explaining reasons for December 6 ruling);

Memorandum Order dated March 3, 2008 ("March 3 Order") (denying City defendants' motion to dismiss for lack of standing); Memorandum Order dated May 13, 2008 ("May 13 Order") (denying parties' cross-motions for summary judgment). In its May 13 Order, the Court resolved the primary legal question bearing on this case, that is, by what standard the Court should evaluate a challenged statute that is facially discriminatory under the FHA. The Court held that it must apply a "heightened level of scrutiny," upholding such a provision only where it " 'further[s], in theory and in practice, a legitimate, bona fide governmental interest and that no alternative would serve that interest with less discriminatory effect.' " May 13 Order at 4–5 (citing *Huntington Branch, NAACP v. Huntington,* 844 F.2d 926, 936 (2d Cir.1988)). The Court found, however, that "the statute's present effect"—i.e., whether it, in practice, helps or hurts children, and whether its aims could be accomplished through non-discriminatory means—"is the subject of genuine and material factual disputes between the parties." *Id.* at 11. Accordingly, the Court denied the parties' cross-motions for summary judgment.

On September 3–5, 2008, the Court conducted an evidentiary hearing to resolve those factual disputes and so resolve plaintiff's requests for injunctive and declaratory relief. In support of the plaintiff's case, the Court heard testimony from Juana Sierra herself; Lance Freeman, Ph.D, an expert in urban planning; Kim Ping Lam, another tenant claiming to have been subject to discrimination under HMC section 27–2076(b); and Susan Cohen, a senior staff attorney and community justice project coordinator at Manhattan Legal Services and a longtime organizer of SRO residents. In support of the defendants' case, the Court heard testimony from Moon Wha Lee, Ph.D., Assistant Commis-

sioner for Housing Policy Analysis and Statistical Research at HPD; Roger Hart, Ph.D., an expert in environmental psychology; Mario Ferrigno, Assistant Commissioner for the Division of Code Enforcement at HPD; Paul Harkin, a supervising construction inspector from DOB; Frank Richards, Chief Inspector in the Lead Division at HPD; and Michael O'Connell, a supervising inspector at HPD.

Before addressing the merits of Sierra's challenge, the Court turns initially to the City defendants' motion, renewed during the bench trial, to dismiss Sierra's claims for lack of standing. This is not the first time the City has challenged Sierra's standing to bring this suit. When Sierra first filed her Complaint, she occupied, with her two young children, two SRO units at 24 West 119th Street in Manhattan. While this action was pending, however, she entered into a stipulation with her landlord, former defendant Emad Ibrahem, whereby she vacated the unit and received thousands of dollars in compensation. The City defendants subsequently asserted that because Sierra no longer occupied an SRO and, in their view, was unlikely to find one that she could afford, section 27–2076(b) no longer caused her any "injury in fact" and thus she lacked standing to challenge it. The Court disagreed for two reasons. First, it found that Sierra already had suffered an injury directly traceable to the challenged provision, because it was the basis of the building code violation issued against her landlord, which was in turn the ground on which he commenced eviction proceedings against her. Second, the Court found that Sierra had made "a sufficient (if thin) showing that section 27–2076(b) continues to limit her available housing options" because—at least at that stage of litigation—it appeared that Sierra was actively seeking to occupy an SRO and that some such

units might be available at a price she could afford. March 3 Order at 5–8. Sierra's settlement with the landlord did not moot her claims against the City in these regards.

In support of its renewed motion, the City defendants argue that evidence from the trial casts doubt on both of the Court's earlier rationales. Taking the second rationale first, the City defendants contend that Sierra's testimony during the trial demonstrates that she is not, in fact, seeking to rent an SRO. Specifically, in questioning Sierra about her apartment search, the City asked her, "would you consider sharing your bathroom with strangers?" (defined as non-family members) and "would you consider sharing your kitchen with people other than family?" Sierra answered "no" to both questions. Tr. 42:15–23.[1] While the Court's prior determination on standing turned on the availability of SRO units to Sierra, the City defendants now argue that regardless of those units' availability, Sierra will not again be subject to HMC section 27–2076(b) because she is not interested in occupying an apartment covered by the provision.

Sierra responds, primarily, that she is sufficiently injured by being deprived of the *choice* of whether to live in an SRO or not. Plaintiff's Post–Trial Memorandum of Law ("Pl.Mem.") at 6. Yet the Court fails to see how Sierra suffers from being deprived of a choice that she does not wish to make. If Sierra sought to challenge a similar provision in another city where she had no intention of residing, for example, surely she would not be harmed by any limitations on her housing options in that city.[2] *Cf. Gladstone, Realtors v. Bellwood,* 441 U.S. 91, 113 n. 25, 99 S.Ct. 1601, 60 L.Ed.2d 66 (1979) (approving of district court's dismissal on standing grounds of two plaintiffs who lived outside the area alleged to have been affected by defendants' discrimination and who had failed to allege any other harm).

■ Ultimately, however, the Court need not resolve the question of whether the provision's possible future effects on Sierra are sufficient to confer standing. While that factor may bear on Sierra's ability to seek injunctive relief, the requirements of Article III standing are satisfied so long as Sierra has already suffered a cognizable injury.

As to the Court's earlier finding that Sierra had already been harmed by HMC section 27–2076(b), *see* March 3 Order at 5,

---

**1.** If these answers seem puzzling in light of the fact that Sierra previously did occupy SROs, the explanation is that Sierra's prior living arrangement was, by all accounts, highly atypical of SRO living. Sierra's two units at 24 West 119th Street were technically classified as SRO units, *see* Pl.Ex. 5, but Sierra did not, in fact, share a kitchen or bathroom with anyone outside her family. *See* Tr. 40:22–23; 42:9–14. According to Sierra's testimony, she occupied two units that each had a kitchenette, and her two units, which were the only ones on the floor, shared a bathroom with one another but with no other tenants. *Id.*

**2.** For this reason, *UAW v. Johnson Controls,* 499 U.S. 187, 111 S.Ct. 1196, 113 L.Ed.2d

158 (1991), on which Sierra relies, is inapposite. It is true that the Supreme Court ruled in that case that depriving the petitioners of a "choice"—there, the choice "as to whether they wish to risk their reproductive health for a particular job"—amounted to impermissible discrimination. *Id.* at 197, 111 S.Ct. 1196. In *Johnson Controls,* however, that choice was one that the petitioners undisputedly wished to make: i.e., the petitioners wanted to obtain the battery-making jobs from which the company excluded them. *Id.* at 192, 111 S.Ct. 1196. Here, Sierra does not wish to avail herself of the opportunity to live in an SRO. In any event, the Supreme Court did not consider any challenge to the petitioners' standing in *Johnson Controls.*

the City argues that the Notice and Violation of Hearing issued by the DOB against Sierra's landlord, previously not presented but now in evidence before the Court, indicates that it was for a violation of HMC section 217, which forbids occupancy contrary to the certificate of occupancy, and not for a violation of 27–2076(b). *See* Pl. Ex. 9 ("DOB Violation"). However, while the DOB Violation does cite section 217, it also, in describing the "violating conditions observed," states that "rear apt. # 3 (1st floor) [one of Sierra's units] had a 14 year old female child.... The above situation doesn't comply with Housing Maintenance Code 27–2076 prohibited occupancies: ... B. No rooming unit shall be occupied by a family with a child under the age of 16." *Id.* Given this specificity, it is fair to construe the DOB Violation as one both for occupancy contrary to the certificate of occupancy and occupancy in violation of section 27–2076(b).[3] Indeed, Sierra's landlord cited the latter violation (as well as occupancy contrary to Sierra' lease agreement) in issuing, first, a Ten Day Notice to Cure and, second, a Thirty Day Notice of Termination, which notices culminated in the landlord's bringing holdover proceedings against Sierra. *See* Pl. Exs. 10–11.[4]

Because Sierra has already suffered a "'distinct and palpable injury'" as a result of HMC section 27–2076(b), she has met "the sole requirement for standing to sue" under both the FHA and Article III. *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 372, 102 S.Ct. 1114, 71 L.Ed.2d 214 (1982) (citing *Warth v. Seldin*, 422 U.S.

490, 501, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975)). This is true regardless of whether Sierra continues to suffer an injury redressible through injunctive relief. *Cf. id.* at 370–71, 102 S.Ct. 1114 ("Irrespective of the issue of injunctive relief, respondents continue to seek damages to redress alleged violations of the Fair Housing Act.... Given respondents' continued active pursuit of monetary relief, this case remains definite and concrete, touching the legal relations of parties having adverse legal interests." (internal quotation marks omitted)).

■ Accordingly, the Court turns to the merits of the plaintiff's claims for injunctive and declaratory relief. HMC section 27–2076(b) provides, in relevant part:

> No rooming unit shall be occupied by a family with a child under the age of sixteen years, except that if a child is born to a family residing in such accommodations, the unlawful occupancy shall not commence until one year after the birth of such child.

The HMC further defines a "rooming unit" as "one or more living rooms arranged to be occupied as a unit separate from all other living rooms, and which does not have both lawful sanitary facilities and lawful cooking facilities for the exclusive use of the family residing in such unit." HMC § 2004(15). The City of New York enacted section 27–2076(b) in 1960 to protect children from what it deemed to be the inappropriate, unsafe, and unhealthy

---

**3.** During trial, the parties disputed whether an inspector from DOB would possess the authority to issue a violation of HMC section 27–2076(b). *See, e.g.,* Tr. 215:15–216:2; 220:1–224:11. For a variety of reasons, the Court is not satisfied that the answer to this question was proved at trial one way or the other. Accordingly, the Court takes the DOB violation at face value.

**4.** That Sierra herself understood the holdover proceedings to have been brought because her landlord "wanted [her] to pay more" is immaterial. Tr. 44:23–25. The grounds stated in the Ten Day and Thirty Day Notices are more conclusive indicators of Sierra's landlord's basis for commencing the proceedings.

environments of SROs.[5]

As the Court noted in its May 13 Order, the rationales cited by the City at the time the provision was enacted reflect a legitimate, bona fide governmental interest; however, the question now facing the Court is whether, today, the provision works "in practice" to further those interests. May 13 Order at 7–8. The burden of so proving falls on the City defendants, and the Court finds that the evidence adduced by the City defendants during the trial is sufficient to meet that burden.

The critical feature separating a rooming unit subject to HMC section 27–2076(b) from a unit not subject to that provision is that a rooming unit "does not have both lawful sanitary facilities and lawful cooking facilities for the exclusive use of the family residing in such unit," i.e., it lacks either a private kitchen or a private bathroom or both.[6] Accordingly, the Court has considered *only* evidence pertaining to risks necessarily or very strongly associated with residences lacking such features.

This limitation led the Court to disregard a variety of evidence offered by the City in support of the provision. For example, the City claimed that SROs were particularly likely to be unhealthy for children because of the "demographic profile of rooming unit residents." *See* Expert Report and Disclosure of Roger A. Hart ("Hart Report"), Def. Ex. C, at 37–39. The City's argument was, in essence, that SRO buildings are more likely than other apartment buildings to be inhabited by single male households and by those with substance abuse problems and other special needs. While the former is statistically true, *see* Expert Report and Disclosure of Moon Wha Lee, Ph.D. ("Lee Report"), Def. Ex. A, at 8, the conclusion that the presence of such households has a detrimental impact on children is one that could rely only on speculation and on impermissible stereotypes. *See Cmty. House, Inc. v. City of Boise*, 490 F.3d 1041, 1050 (9th Cir.2007) (holding that facially discriminatory restrictions under the FHA may not be justified by stereotypes); *Bangerter v. Orem City Corp.*, 46 F.3d 1491, 1503 (10th Cir.1995) ("Restrictions predicated on public safety cannot be based on blanket stereotypes...."). As to the latter, the City defendants produced, at most, anecdotal evidence that special needs residents are more common in SROS, and have primarily relied, again, on stereotypes.[7] In any

---

5. *See, e.g.,* NYLS' New York City Bill Jacket, 1960 Local Law 6 (Jan. 19, 1960) (declaring that single room occupancy units without toilet and kitchen facilities "do not constitute decent, safe and healthful living accommodations for children under the age of sixteen years," and that "the rearing of children of such age in such inadequate and undesirable dwelling accommodations endangers their health, safety and welfare and is detrimental to the welfare of the people of the city"); Report Re. Proposed Local Law, Int. No. 331, Pr. Nos. 390, 464, Dated Feb. 2, 1960 (recommending approval of provision because SRO units, with their "[l]ack of family privacy, lack of proper kitchen facilities and lack of adequate, private sanitary facilities[,] a[dd] up to a most unhealthy environment in which to rear children").

6. Sierra's own SRO arrangement was, by all accounts atypical. *See supra* note 1. However, because Sierra is asking the Court to enjoin enforcement of HMC section 27–2076(b) across the board, the Court has made an effort to consider the effects on children of the more standard SRO unit: a room or rooms whose inhabitants share an exterior kitchen and/or bathroom with other tenants.

7. *See* The Relationship Between Residence in a SRO and Child Health and Well Being, Report Prepared by Lance Freeman, Ph.D. for the Plaintiff Juana Sierra ("Freeman Report") at 16 ("The City of New York ... impl[ies] that the mentally ill, substance abusers and those with health problems ... are likely to be residing in SROS[and that] residents such as these make bad neighbors for children....

event, neither the presence of a greater number of single male households nor those with special needs is in any way *particularly* linked to the unique features of an SRO: the lack of an in-unit kitchen or bathroom.

Similarly, the Court lends no weight to the City defendants' claim, primarily advanced earlier in this litigation, that SRO housing tends to be of lower overall quality—in terms of maintenance and building defects and general building dilapidation—than non-SRO housing. The report of plaintiff's expert, Dr. Lance Freeman, strongly suggests that both as a logical and an empirical matter SRO housing is not likely to be meaningfully worse with respect to those criteria than is other low-end housing. *See* The Relationship Between Residence in a SRO and Child Health and Well Being, Report Prepared by Lance Freeman, Ph.D. for the Plaintiff

Juana Sierra ("Freeman Report") at 3–14.[8] By contrast, the City defendants have offered no material evidence supporting their argument in this regard.

Even disregarding arguments about substandard quality and demographic profiles, however, the City defendants have offered substantial evidence that the defining features of SRO housing are detrimental to children.

█ First, the fact that a bathroom is removed from a family's living space and shared with non-family members necessarily has impacts both on children's health and safety and on their privacy and development. Shared bathrooms expose children to dangers that their parents—no matter how conscientious—are unable to control: primarily, exposure to strangers and exposure to contagions. *See* Hart Report ¶¶ 12, 60–61, 67; Tr. 317:2–25.[9] The

---

In making this argument the City is subscribing to stereotypes of SROs are part of 'skid row' and as a housing of last resort for very poor men.").

In addition, the Court notes Cohen's very helpful testimony that in fact, in many SRO residences, strong social networks do exist. *See* Tr. 79:10–16.

8. The Court has considered Dr. Lee's critique regarding the sampling and potential non-sampling errors of Dr. Freeman's analysis; however, the Court agrees with Dr. Freeman that his results, at the least, "are useful for gauging the overall quality of SRO units" and "the direction of the relationships" between SROs and non-SROs. Freeman Report at 15.

The Court further notes that, even if it found SRO housing to have significantly more building and maintenance defects than non-SRO housing or found that Dr. Freeman's results were not conclusive either way, the plaintiff would have a strong argument that the City defendants could effectively address that problem through stricter enforcement of those provisions of the housing code directed at such defects.

9. The plaintiff has challenged the entire body of testimony presented by Dr. Hart on the

ground that he does not qualify as an expert under Federal Rule of Evidence 702. *See, e.g.,* Plaintiff's Reply to Defendants' Post–Trial Memorandum of Law ("Pl. Reply Mem.") at 9. Dr. Hart's testimony may not be admissible as "scientific" expert evidence under *Daubert v. Merrell Dow Pharmaceuticals,* 516 U.S. 869, 116 S.Ct. 189, 133 L.Ed.2d 126 (1995), but it is certainly admissible as expert evidence under *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 151–52, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999) (clarifying that courts must ensure the reliability of expert evidence that does not purport to be purely "scientific," but that they should not subject such evidence to the strict requirements set forth in *Daubert*). Here, Dr. Hart drew on a variety of both qualitative and quantitative studies in the fields of psychology, medicine, urban planning, public health, and other disciplines, as well as his substantial personal experience, in preparing his report. *See* Hart Report at ¶ 1–6 & Attachment 2. The Court was, and remains, fully satisfied that his testimony is reliable and admissible under Rule 702. *See Kumho Tire Co.,* 526 U.S. at 152, 119 S.Ct. 1167 (granting the trial judge "considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable").

first may seriously compromise a child's safety; for example, Dr. Hart estimated that a child might encounter as many as thirty or forty different individuals in and around a single bathroom,[10] *see* Tr. 319:3–14, and the Court heard anecdotal evidence that locking mechanisms on shared bathrooms are frequently either broken or inadequate, *see* Tr. 230:5–15 (testimony of O'Connell). As to risk of infection, while the Court received no conclusive evidence that SRO bathroom facilities are, as a rule, less hygienic than in-unit bathrooms,[11] it is impossible, as a logical matter, for a parent to control the cleanliness of a shared bathroom in the way he or she might a private bathroom. *See* Tr. 319:3–14. Additional problems stem from the fact that younger children cannot use an exterior bathroom without adult supervision; where it is lacking, they may endanger themselves by attempting to use the bathroom unassisted or by waiting, possibly risking medical consequences. *See* Hart Report ¶ 60, 63. Furthermore, Dr. Hart presented research from psychology and social science literature concluding that shared, exterior bathrooms have negative impacts on children's development: for young children, for example, by thwarting toilet training, and for older children and adolescents by depriving them of privacy needed for healthy development. *See* Tr.

302:10–303:20; Hart Report ¶¶ 59–60, 69–73, 78.

Shared kitchens likewise pose health and safety risks for children. Kitchens are dangerous places for children, but it is difficult if not impossible for a parent to "child-proof" a shared kitchen; nor can a single parent leave a child unattended in the rooming unit while preparing meals. *See* Tr. 310:1–312:18; 315:14–316:18; Hart Report ¶ 17. Parents face additional obstacles to safe preparation of food; for example, many shared kitchens lack refrigerators, but even where refrigerators are present, parents may hesitate to use them because of concerns over food security. *See* Hart Report ¶¶ 79–82; Tr. 204:24–25 (testimony of Richards).[12] It is also a particular challenge to keep shared kitchens clean for reasons similar to those related to shared bathrooms, and thus food preparation in shared kitchens carries greater health risks; there are, moreover, safety risks associated with bringing food back to eat in the living unit. *See* Hart Report ¶ 15, 41 & fig. 7; Tr. 315:8–316:6.

Finally, children's physical and psychological development is likely to be impeded by the nature of the living space within an SRO. The fact that SROs tend to be quite small is not, in and of itself, the problem, for lack of space is not indispensably linked to SRO housing: SROs, like regular apartments, can be small or large.[13] By

---

**10.** Although by law only six individuals may share a bathroom, Tr. 203:6–7 (testimony of Richards), as a practical matter, the residents of a floor may use any bathroom on that floor. This fact led to Dr. Hart's estimate. *See* Tr. 317:7–318:15.

**11.** Several witnesses testified that SRO bathrooms—like bathrooms in all low-income housing—"run the gamut" in terms of cleanliness, *see, e.g.,* Tr. 81:2–3 (testimony of Cohen), and Dr. Hart testified that the bathrooms he observed had in fact been recently cleaned, *see* tr. 296:16–19. However, Inspector Richards testified that "[i]n the majority of cases

the bathrooms are not clean," Tr. 203:15, 205:15–18, and Inspector O'Connell testified similarly, *see* Tr. 229:6–7.

**12.** Dr. Hart reported that during his site visits, he observed little to no food stored in shared refrigerators. *See* Tr. 312:22–25.

**13.** The Court did hear anecdotal evidence that SROs tend to be much smaller than non-SRO apartments, and that may be the case. But if the City were primarily concerned with the size of children's living space, it would be more appropriate to exclude them from apart-

definition, however, only SROs may consist of a single room.[14] (Any non-SRO housing would have, at the least, a separate bathroom.) Dr. Hart cited research suggesting that living in a "single undifferentiated space," can delay development and deny children needed refuge. *See* Tr. 276:17–277:1; 295:1–10; Hart Report ¶¶ 97, 99.

In short, the essential elements of an SRO—lack of in-unit bathroom, lack of in-unit kitchen, and, usually, single-room living space—are detrimental in many respects to the welfare of children and inherently cannot be remedied by alternative measures. Moreover, as Dr. Hart repeatedly emphasized, these multiple harms cannot be considered independently, but rather have cumulative negative impacts. *See, e.g.*, Hart Report ¶ 10.

The plaintiff challenges the above evidence, arguing that it does not provide adequate support for HMC section 27–2076(b) for several reasons. First, as an evidentiary matter, the plaintiff asserts that the studies cited by Dr. Hart may substantiate his claims about the *possible* effects of certain aspects of SROs on children, but he has cited no scholarly *proof* that such effects in fact result. In particular, she notes that he has not referenced any longitudinal or cross-sectional studies demonstrating that they afflict children raised in SROs more severely than others. *See, e.g.*, Freeman Report at 15–21.

In a perfect world, legislatures would always have scientific studies to guide and justify the measures they enact; however, such studies very rarely exist, and in any event, are in no way required to support a challenged statute—even one, like this one, that is facially discriminatory. To require such studies before finding that an ordinance "further[s] ... in practice, a legitimate, bona fide governmental interest" would be, in effect, to hold that no facially discriminatory statute ever could be upheld. Clearly, that is not the law, nor should it be.

As the legislative history of the FHA indicates, Congress intended to prohibit the exclusion of families with children from housing opportunities based on invidious discrimination and stereotypes. *See* Fair Housing Amendments Act of 1988 House Report, H.R.Rep. No. 100–711, at 19 (1988), *reprinted in* 1988 U.S.C.C.A.N. 2173. Such discrimination is a far cry from the City's rationales here, however-at least as limited by the Court. Unlike in other cases where FHA challenges were sustained, the City has produced extensive evidence demonstrating concrete physical and psychological effects of SRO living on children, rather than merely generalizations and conclusory assertions. *See Cmty. House, Inc.*, 490 F.3d at 1051 (finding that "[t]he City provides little support to establish that the men-only policy benefits women and families by protecting their safety"—there, a single conclusory affidavit—but refusing to "foreclose the possibility that at a later stage in this litigation, the City may be able to provide evidence to establish that its men-only policy is indeed justified by legitimate safety concerns"); *Bangerter*, 46 F.3d at 1504–05 (holding that the facts in the record at that time did not support restrictions on the

ments below a certain square footage, for example, rather than from SROs.

14. They do not have to consist of a single room, as a "rooming unit" for purposes of section 27–2076(b) is defined as "one *or more* living rooms arranged to be occupied as a unit" and lacking either a bathroom or a kitchen (emphasis added); but in practice it appears that most SROs do consist of single rooms, which is why, indeed, they are referred to as "Single Room Occupancy" units. *See* Hart Report ¶ 95; Tr. 91:15–17 (testimony of Cohen).

living opportunities of disabled individuals, but emphasizing that restrictions tailored to those individuals "could be acceptable under the FHA[ ] if the benefit to the handicapped in their housing opportunities clearly outweigh whatever burden may result to them" and that "[i]t could be that the evidence will show that [one of the restrictions imposed] might prove to be beneficial to the handicapped").[15] Indeed, the Court denied the City's summary judgment motion, and conducted this evidentiary hearing, precisely so that the City would be forced to produce this type of detailed, objective support.

The plaintiff's second major challenge to the City's evidence is that, even if the Court finds the City's proof sufficient to establish that SRO housing has negative impacts on children, the City has failed to prove that those impacts are worse than any that children would suffer in feasible alternative housing situations. In other words, if children are excluded from SROs, the only available housing options their families can afford are likely to be just as problematic. This argument is a variation of the claim the plaintiff advanced at the summary judgment stage, which was that to the extent section 27–2076(b) drives families from SROs, it delivers them into homeless shelters or onto the streets.

Yet the Court heard no material evidence supporting this hypothesis. As an initial matter, the only displaced family of which the Court is specifically aware—Sierra's own family—is in neither situation. Rather, Sierra and her children now live with her sister and her sister's family. *See* Tr. 34:14–35:2. While the Court in no way suggests that this situation is ideal—on the contrary, the "doubled up" conditions are undoubtedly crowded—it is a far cry from living on the streets; moreover, there is a strong argument to be made that because Sierra and her children now share kitchen and sanitary facilities with family members only, this arrangement is safer for her family than the typical SRO.

Furthermore, the Court heard testimony from Dr. Lee that the vast majority (96 percent) of available apartments in New York City in Sierra's price range are in fact regular apartments, not SROs. Lee Report at 7. Dr. Lee concluded that because the number of families living in SROs is fewer than the number of vacant apartments available for less than $600, perfect enforcement of 27–2076(b) would not render any families homeless. *Id.* at 3. While the Court appreciates plaintiff's argument that the low vacancy rate might make apartments in that price range hard to acquire despite their absolute number, and that Dr. Lee's conclusions is thus overly simplistic,[16] the statistic shows, at the

---

**15.** Outside the housing discrimination context, courts have upheld facially discriminatory restrictions where they were shown to be grounded in legitimate safety concerns. *See, e.g., Dothard v. Rawlinson,* 433 U.S. 321, 336–337, 97 S.Ct. 2720, 53 L.Ed.2d 786 (1977) (upholding male-only requirement for job of prison guard in maximum-security male penitentiaries because there was "substantial testimony from experts on both sides of this litigation that the use of women as guards in 'contact' positions under the existing conditions ... would pose a substantial security problem, directly linked to the sex of the prison guard," and consequently, being male

was a "bona fide occupational qualification" under Title VII).

**16.** The Court further recognizes that, as Dr. Freeman testified, the vacancy rate—which Lee did not calculate—is a useful indicator of the interaction between supply and demand, and that according to Dr. Freeman's calculations the vacancy rate of regular apartments is significantly lower than the vacancy rate of SROs. Rebuttal Prepared by Lance Freeman, Ph.D. for the Plaintiff Juana Sierra, at 1–5. Nonetheless, the Court accepts Lee's testimony that the number of vacant apartments does, at least directly, reflect on the supply and demand of housing, as the absolute num-

least, that SROs in no way present the *only* residential option for families of Sierra's means. This is particularly true in boroughs outside of Manhattan.[17]

Likewise, the Court heard no material evidence tending to support the plaintiff's other primary argument at summary judgment: that section 27–2076(b) is enforced primarily by landlords seeking to evict families with children so that they can rent to higher-paying tenants. In terms of statistical information regarding who reports section 27–2076(b) violations, it appears that no information is available one way or the other, both because landlords are likely to report violations anonymously and because the HPD complaint database is not equipped to record complaints originating from landlords as opposed to other sources. *See* Tr. 126:5–14. However, the plaintiff was not able to come forward even with anecdotal evidence of landlords' engaging in such conduct—an inability that would be inexplicable if the practice were as widespread as the plaintiff claimed.[18] Indeed, Cohen, who had extensive experience organizing SRO tenants against landlord abuses, said she had never encountered a charged violation of 27–2076(b) in forty years of experience. Tr. 90:8–22; 92:14–16. What is more, Cohen stated that she only even observed children living in SROs a couple of times during that entire period, *see* Tr. 90:8–22, a level of frequency that appears to comport with the experiences of other witnesses.[19] Finally, Ferrigno testified that in the past ten years, HPD has issued only 95 violations of 27–2076(b), 58 of which were "picked up in the line of [an inspector's] travel," rather than reported. Tr. 130:21–131:2. While this appears to be at least somewhat less than the full count,[20] it still indicates the relative rarity of reported

ber represents what apartments remain available after existing supply and demand have operated. *See* Tr. 256:16–257:4.

17. Ms. Cohen did testify that she believed that individuals who left SROs became homeless, 88:21–89:7, but she did not specifically refer to families. More importantly, the Court found her testimony in this regard to be far too subjective and impressionistic to be accorded material weight.

18. The plaintiff presumably called Kim Ping Lam because plaintiff believed Lam would provide an example of a tenant evicted through a landlord's improper reliance on HMC section 27–2076(b). Lam, however, could testify only, relying on triple and double hearsay, that the business manager at his building told first Lam's wife, and then himself, that his lease was not being renewed because his name was not on the lease *and*, subsequently, that his occupancy was in violation of HMC section 27–2076(b). *See* Tr. 61:2–7; 62:17–21; 64:23–66:11. Yet even if this hearsay were credited, there was no evidence that the City defendants (the parties, after all, that Sierra is seeking to enjoin) ever issued a violation of section 27–2076(b) at Lam's landlord's request, or that any eviction proceedings were ever commenced against Lam. *See* Tr. 66:12–17. And perhaps most amazingly, according to Lam's own testimony, his apartment was not even properly classified as an SRO: it is a five-room apartment with its own kitchen and bathroom for his family's exclusive use. *See* Tr. 56:16–58:14. As the HPD database's records on the building reflect that, indeed, all units therein are "Class B" dwellings, which the Court is told is roughly equivalent to an SRO or "rooming unit," the Court can only conclude that the units are improperly classified. *See* Pl.Ex. 6.

19. Dr. Hart stated that of several hundreds of units in the SRO buildings he visited, he observed only six units occupied by children. *See* Tr. 313:3–5. Inspector Richards noted that over thirteen years of inspecting many hundreds of SRO buildings, he observed children occupying SROs "on one or two occasions." Tr. 202:1.

20. This is the case because two or three years ago, according to Ferrigno, responsibility for fielding complaints on section 27–2076(b) shifted from HPD to DOB. *See* Tr. 132:23–133:3.

violations of 27–2076(b). By way of comparison, HPD issued around 500,000 total violations just last fiscal year, *see* Tr. 15–17–of reported violations of section 27–2076(b). All of this thoroughly discredits the plaintiff's assertion that 27–2076(b) is being widely deployed by landlords in a way that harms families.

In sum, the Court concludes that the City has carried its burden of demonstrating that HMC section 27–7076(b) furthers, in theory and in practice, legitimate government interests in the health, safety and welfare of children that cannot be achieved through other alternatives, and that HMC section 27–2076(b) does not violate the Fair Housing Act. The Court therefore denies Sierra's requests for injunctive and declaratory relief. Moreover, the above conclusion also moots, as a matter of law, Sierra's claim for damages against the City defendants, which presupposed their enforcement of an invalid regulation. Accordingly, the Clerk of the Court is directed to enter judgment dismissing the Complaint with prejudice.

SO ORDERED.