OPINION OF THE COURT
Timmie Erin Elsner, J.
560 West 165th Street Associates, L.E (petitioner) commenced this holdover proceeding against Gladys Figueroa (respondent), for 560 West 165th Street, Apt. 820, New York, New York (hereinafter premises) seeking to recover possession of the premises based upon the alleged violation of a substantial obligation of her tenancy. Respondent submitted a verified answer. Both parties move for summary judgment.
Factual and Procedural Analysis
Petitioner is a limited partnership organized under the laws of the State of New York. Volunteers of America-Greater New York, Inc. (VGA) is a not-for-profit corporation which owns a controlling interest in petitioner. The subject building, also known as “Richard F. Salyer House,” provides “affordable housing ... to a mixed population of families, the elderly, formerly homeless people, and those living with HIV and AIDS” and offers various “on-site support services for residents including case management, drug and alcohol rehabilitation, recreation and linkage to community services and activities.” The building is registered as a multiple dwelling and is governed by the Rent Stabilization Code. The building contains 126 single units and 20 family units.
Respondent has resided in the premises since 2005 when the New York City Department of Homeless Services (DHS) referred respondent, who was homeless, to VGA. A review of the certificate of occupancy reveals the premises are a studio apartment and are not classified as a single-room occupancy (SRO) unit. In point of fact, there are no SRO units in the building. Respondent’s studio contains a kitchen and a bathroom which she does not share with other individuals in the building.
*1008 Respondent’s tenancy is financed by the United States Department of Housing and Urban Development (HUD) Section 8 Housing Assistance Program (HAP), “Section 8 Moderate Rehabilitation Program for Single Room Occupancy Dwellings For Homeless Individuals.” New York City Department of Housing Preservation and Development (PHA or HPD) and petitioner entered into the HAP contract on December 5, 2001, effective as of November 1, 2001. Pursuant to section 1.2 (c)2 of the HAP contract, entitled “Leasing of Contract Units”:
“The Lease must provide that the Contract Unit may only be occupied by the single eligible individual to whom the unit is rented by the Owner. If the PHA [public housing agency] determines that anyone other than, or in addition to such eligible individual is occupying a Contract Unit, the PHA may require the Owner to take appropriate action, as directed by the PHA, including action requiring any occupant who does not have a right to occupy the Contract Unit under the Lease to move from the unit.”
The HAP contract also provides, under section 1.24 (B) (“Impermissible Basis for Denial of Assistance”), that “unwed mothers or recipients of public assistance must not be denied the benefit of housing assistance payments under this Contract because of such status.”
By regulatory agreement, dated February 8, 2002, between the City of New York (acting through HPD) and petitioner, HPD allocated funds received from HUD under various programs to petitioner for acquisition and/or rehabilitation of the subject building. In return, petitioner agreed, among others, that 60% of the units must be rented to “Homeless Tenants”[1] and 40% to “persons of low income.”[2] Respondent’s qualification for the premises is based on her being eligible for Section 8 assistance as a “Homeless Tenant.”
Respondent took occupancy of the premises pursuant to a “Landlord-Tenant Lease Agreement for Single Occupancy,” *1009 dated August 15, 2005, at a monthly rent of $554. Paragraph 13.1 of the lease provides that
“[t]enant understands and agrees that the Apartment is a single room occupancy apartment, financed by the [DHS], and is subject to all Federal and State laws, codes, rules and regulations applicable to single room occupancy apartments including, but not limited to, any such rules prohibiting the occupancy of the single room occupancy apartment by any other person other than the Tenant named in the Lease and Rider. . . . Occupancy by more than one person or any person other than the Tenant named in the Lease and Rider is strictly prohibited, is a default of the Lease and Rider, and is grounds for holdover summary proceedings . . . .”
Thereafter, an authorized source agreement, dated May 27, 2010, between the City of New York (acting through DHS) and VO A provides that VO A must rent 60% of the units in the subject building to “DHS referrals” and that 40% of the units may be filled by individuals who are “eligible residents” as defined in section 45 (a) of the Social Services Law, which is found in article 2-A, title 2, entitled “Single Room Occupancy Support Services Program.” Section 45 (a) provides, in pertinent part, that
“[t]here is hereby established under the administration of the commissioner a single room occupancy support services program, to provide financial assistance, subject to limitations stated in appropriations therefor, in the form of grants, to eligible applicants for eligible costs of services to assist eligible residents of single room occupancy units to live independently.”
Initially, respondent was qualified to reside in one of the 60% of apartments reserved for DHS referrals. In the spring of 2010, she became pregnant. On June 1, 2010, respondent signed an agreement that states because her unit is an SRO for single individuals, she would relinquish her apartment once she gave birth to her child. The respondent was not represented by counsel. On or about January 24, 2011, respondent gave birth to a child, and on or about February 7, 2011, respondent returned to the apartment with her newborn child. Since that time, respondent and her daughter have resided in the premises. No other adult has been in occupancy.
*1010 In February 2011, days after respondent returned to the premises, petitioner served a notice to cure demanding respondent remove her child from the premises or vacate. Petitioner commenced a holdover proceeding, 560 W. 165th St. Assoc., LP v Figueroa, under landlord-tenant index No. 65662/2011 which was discontinued without prejudice on June 16, 2011. Petitioner commenced a second holdover proceeding against respondent, 560 W. 165th St. Assoc. LP v Figueroa, under landlord-tenant index No. 91454/2011 which was dismissed after a traverse hearing on April 25, 2012.
On May 31, 2012, petitioner issued the notice to cure that is the basis of this proceeding. In summary, the notice alleged that: (1) respondent gave birth in January 2011 and it is a violation of her lease to reside with her child in the premises; (2) respondent agreed to relinquish her apartment in an agreement signed June 1, 2010; (3) the presence of respondent’s child is in violation of petitioner’s contract with government agencies; and (4) the housing environment in the building is not supportive of children. Respondent failed to remove her child from the premises or relinquish possession. Petitioner served a 10-day notice of termination and notice to vacate. Thereafter, petitioner commenced this holdover proceeding. By answer, dated September 11, 2012, respondent interposed the defenses which form the basis for her motion for summary judgment.
Analysis
Pursuant to CPLR 3212, summary judgment is a drastic remedy that deprives litigants of their day in court, and it “should only be employed when there is no doubt as to the absence of triable issues.” (See Andre v Pomeroy, 35 NY2d 361, 364 [1974]; see also Doize v Holiday Inn Ronkonkoma, 6 AD3d 573 [2d Dept 2004].) The court’s function is not to determine credibility, but to determine if there exists a triable issue, or if arguably there is a genuine issue of fact. (See S.J. Capelin Assoc. v Globe Mfg. Corp., 34 NY2d 338 [1974].) The movant has the initial burden of proving entitlement to summary judgment and upon such proof, the opposing party must show facts sufficient to require a trial of any issue of fact. (See Winegrad v New York Univ. Med. Ctr., 64 NY2d 851, 853 [1985], citing Zuckerman v City of New York, 49 NY2d 557 [1980].)
Applicable Statutory Provisions
New York City Housing Maintenance Code (HMC) (Administrative Code of City of NY) § 27-2075 provides, in pertinent part:
*1011 “Maximum permitted occupancy.
“a. No dwelling unit shall be occupied by a greater number of persons than is permitted by this section.
“(1) Every person occupying an apartment in a class A or class B multiple dwelling or in a tenant-occupied apartment in a one- or two-family dwelling shall have a livable area of not less than eighty square feet. The maximum number of persons who may occupy any such apartment shall be determined by dividing the total livable floor area of the apartment by eighty square feet. For every two persons who may lawfully occupy an apartment, one child under four may also reside therein, except that a child under four is permitted in an apartment lawfully occupied by one person. . . .
“The floor area of a kitchen or kitchenette shall be included in measuring the total liveable floor area of an apartment but the floor area for private halls, foyers, bathrooms or water closets shall be excluded” (emphasis added).
In this proceeding, the court can not determine whether the premises are subject to restricted occupancy based upon its size. It does however note that where occupancy is restricted to one adult, “a child under four is permitted in an apartment lawfully occupied by one person.”
HMC § 27-2076 (b) prohibits, in pertinent part, families with children under the age of 16 from residing in SRO units, which are defined in turn as “rooming units” that lack either an in-unit kitchen or an in-unit bathroom. In Sierra v City of New York (579 F Supp 2d 543 [SD NY 2008]), the United States District Court, Southern District determined it was not a violation of the Federal Fair Housing Act to prohibit children from occupying an SRO unit or “rooming unit” as defined by the HMC. As the challenged statute was facially discriminatory under the FHA, the District Court established a standard for its review. The court held that it must apply a “heightened level of scrutiny,” and found such provisions are to only be upheld where they “further[ ], in theory and in practice, a legitimate, bona fide governmental interest and that no alternative would serve that interest with less discriminatory effect.” (Id. at 545, citing Huntington Branch, N.A.A.C.P. v Town of Huntington, 844 F2d 926, 936 [2d Cir 1988].) The court stated that the statute’s present effect — i.e., whether it, in practice, helps or hurts children, and whether its aims could be accomplished *1012 through non-discriminatory means — “is the subject of genuine and material factual disputes between the parties.” (Id.)
As defined by the District Court, a “rooming unit” under the HMC is “one or more living rooms arranged to be occupied as a unit separate from all other living rooms, and which does not have both lawful sanitary facilities and lawful cooking facilities for the exclusive use of the family residing in such unit.” (Id. at 547.) “Rooming units” lack “either a private kitchen or a private bathroom or both.” (Id. at 548.) The court held that the HMC’s restriction of children under age 16 is not discriminatory because “the essential elements of an SRO — lack of in-unit bathroom, lack of in-unit kitchen, and, usually, single-room living space — are detrimental in many respects to the welfare of children and inherently cannot be remedied by alternative measures.” (Id. at 551.)
In this instance, it is clear that the premises are not an SRO as defined by the HMC. Not only does it have a private kitchen and bathroom but it is categorized as a studio apartment by the New York City Department of Buildings. Clearly, the provisions of section 27-2076 (b) of the HMC which prohibit children under the age of 16 from residing in “rooming units” do not apply to the premises.
A second definition of an SRO appears in section 45 (5) of the Social Services Law. Social Services Law § 45 (5) defines a “single room occupancy unit” as a “private room providing living and sleeping space for no more than two persons with access to bathing and toilet facilities . . . The unit itself may contain a kitchen and/or bathroom.” Pursuant to Social Services Law § 45 (3), an “eligible resident” shall mean “a person residing in a single room occupancy unit who is in need of services to live independently.” In this instance, respondent is an eligible person pursuant to Social Services Law § 45 (3). She came into possession of the premises which fit the description of an SRO as defined in Social Services Law § 45 (5). By definition, more than one person may reside in this type of housing accommodation. Children are not barred from sharing such a unit with their parent, particularly where by definition they may be occupied by more than one person.
Applicable Contractual Provisions
Petitioner receives rent subsidies for occupants pursuant to a HAP contract, dated November 1, 2001, annexed as exhibit G to the petitioner’s moving papers. Section 1.2A (1) of the agreement entitled “Eligible Tenants” provides a contract unit may only be rented to an eligible individual.
*1013 Section 1.2 (c) “Lease” states:
“1. The Lease between the Owner and each assisted individual must be in accordance with HUD requirements. The lease must include all provisions required by HUD and must not include any provisions prohibited by HUD.
“2. The Lease must provide that the Contract Unit may be occupied by the single eligible individual to whom the unit is rented by the Owner. If the PHA determines that anyone other than, or in addition to such eligible individual is occupying a Contract unit, the PHA may require the Owner to take appropriate action, as directed by the PHA, including action requiring any occupant who does not have a right to occupy the Contract Unit under the Lease to move from the unit” (emphasis added).
Pursuant to section 1.11 (B) “Termination of Tenancy,” the owner may not terminate tenancy or evict an assisted individual except in accordance with HUD requirements. “The HUD requirements in effect at execution of this contract are stated in Exhibit C to this contract.” Unfortunately, “Exhibit C” is not annexed to the HAP contract provided by the petitioner or respondent in their moving papers.
The court can not determine whether the petitioner complied with HUD requirements before commencing this proceeding. What is clear is that the PHA (in this case HPD) may in its discretion require petitioner herein to commence legal proceedings to enforce the HAP contract. Petitioner can in its discretion, without PHA’s mandate, commence enforcement proceedings in the event an occupant violates the HAP contract. The HAP contract does not bar children from occupying the premises. The HAP contract does not provide that a tenant’s status as a qualified individual is rescinded if she bears a child after assuming occupancy. It does not provide her status is revoked if she chooses to allow the child to live with her. The HAP contract suggests but does not limit legal action to a cause of action against only the unauthorized occupant (in this instance, respondent’s child). Nothing in the HAP contract compels petitioner to seek respondent’s eviction.
Parenthetically, petitioner alleges it must take action against respondent as her rent subsidy will be terminated based upon occupancy of the premises with her child. Paragraph 1.24 of the HAP contract entitled “Nondiscrimination” provides:
“A. Prohibition of Discrimination
*1014 “The Owner must not in the selection of assisted persons, in the provision of services, or in any other manner, discriminate any person on the grounds of race, color, creed, religion, sex, national origin, familial status or handicap.
“B. Impermissible Bases for Denial of Assistance “Unwed mothers or recipients of public assistance must not be denied the benefits of housing assistance payments under this contract because of such status.
“C. Compliance with Requirements Under The Fair Housing Act, Executive Order 11063 and Title VI.
“In carrying out this contract, the Owner must comply with:
“1. The Fair Housing Act (42 U.S.C. 3601-19) and implementing regulations at 24 CFR Part 100
“2. Executive Order No. 11063 (Equal Opportunity in Housing) and implementing regulations at 24 CFR Part 107.
“3. Title VI of the Civil Rights Act of 1964 (42 U.S.C. 2000d) (Nondiscrimination in Federally Assisted Programs) and implementing regulations at 24 CFR Part I.”
It appears that based upon these provisions, it would be a violation of the HAP contract to terminate respondent’s rent subsidy. Petitioner’s fears regarding termination of the subsidy appear to be unfounded.
The court has also reviewed the regulatory agreement between HPD and petitioner, dated February 8, 2002. Pursuant to that agreement, petitioner is required to maintain a mix of “homeless tenants” and “persons of low income” in order to qualify for government funding. No provision of the regulatory agreement prohibits children from occupying the premises. No provision rescinds respondent’s status as a qualified tenant in the event she gives birth to a child and chooses to remain in the premises.
Petitioner also relies on an authorized source agreement between DHS and VGA, dated May 27, 2010 (DHS agreement), as grounds for respondent’s eviction. The court notes that the DHS agreement was executed at approximately the same date respondent notified petitioner of her pregnancy. No portion of the DHS agreement bans children from the premises. It outlines the number of units in the building to be occupied by DHS *1015 referrals (of which respondent is one) and the number to be occupied by eligible residents as defined by the Social Services Law.
Exhibit A to the DHS agreement, the “Program Description/ Service Plan,” does not ban children from the premises or building. The first paragraph specifically states the “[VGA] Richard F. Salyer House provides permanent supportive and affordable housing in a service enriched environment to a mixed population of families, the elderly, formerly homeless people, and those living with HIV and AIDS.” In essence, the program is dedicated to assisting individuals like respondent and not evicting them.
The DHS agreement, exhibit A, paragraph 19, which relates to house rules/lease/eviction, states:
“Development of SRO House Rules
“Richard F. Salyer House has developed house rules, which are reviewed with all residents upon admission and posted in the facility on every floor. The house rules were developed with input from residents and reflect Volunteers of America’s commitment to providing a safe, secure and comfortable environment for all residents of our facilities.”
It goes on to outline penalties for an occupants noncompliance with such house rules. The house rules are not annexed as an exhibit to the petitioner’s moving papers. The proceeding is not based upon a violation of the house rules and therefore the court must assume that they do not bar children from occupying the premises or families from living together in the same unit.
In summary, a review of the contracts and agreements between the petitioner and federal and city agencies reveals that while the premises are designated as an SRO, there is no ban on children or infants occupying same. Specific provisions exist which bar denial of benefits to respondent on the basis that she is an unwed mother. This ensures that she will continue to receive the rent subsidy provided with respect to her occupancy of the premises.
Respondent’s Lease
The issues remaining are whether respondent’s continued occupancy of the premises with her child violates the terms of the lease and, if so, whether said lease terms are enforceable and whether her agreement to vacate the premises, dated June 1, 2010, is enforceable.
A review of the lease reveals that it does not specifically bar children from occupying units in the building. Various provi *1016 sions utilize language such as “Tenants Household” and “Tenants Family” (see exhibit E to petitioner’s moving papers ¶¶ A, 1, 13.1).
Petitioner relies on paragraph 13.1 as grounds for respondent’s eviction:
“Single Occupancy 13.1. Tenant understands and agrees that the Apartment is a [SRO] apartment financed by the [DHS], and is subject to all Federal and State laws, codes, rules and regulations applicable to [SRO] apartments including, but not limited to, any such rules prohibiting the occupancy of the [SRO] apartment by any other person other than the Tenant named in the Lease and Rider. The Apartment may be let only by the Landlord and occupied only by the Tenant named in the Lease and Rider. Tenant confirms that tenant will be the sole individual to reside in the Apartment. No other person besides Tenant shall be permitted to occupy the Apartment for any length of time for any reason whatsoever. The Apartment may not be sublet by the Tenant. Occupancy by more than one person or any person other than the Tenant named in the Lease and Rider is strictly prohibited, is a default of the Lease and Rider, and is grounds for holdover summary proceedings or other set forth in paragraph 28 of the lease to eject tenant and such other occupant. In the event Tenant’s household composition changes, Tenant must notify landlord in writing within 5 days of such change, and Tenant must vacate the Apartment within 30 days of the Tenant’s notice to the Landlord. In the event Tenant does not notify Landlord of changes to Tenant’s household composition, tenant must vacate apartment within 30 days written notice from Landlord, and Landlord has the right to proceed against Tenant for violation of the Lease or Rider under paragraph 28 of the lease or pursuant to any other proceeding regardless of any delay in transmitting the written notice to Tenant. In any proceeding brought by Landlord pursuant to this paragraph 5, Tenant waives any defense to such proceeding based on laches or delay by landlord in enforcing the Lease or Rider. Landlord shall not be required to provide a larger or other apartment to Tenant under any circumstances. Tenant may, at Tenant’s option, apply *1017 to Landlord for a larger or other apartment. Such an application by Tenant shall not stay or otherwise prevent landlord from proceeding against and evicting Tenant for violation of the terms of the Lease and Rider.”
Petitioner also relies on paragraph 13.2 of the lease:
“Compliance With Rules and regulations 13.2. Tenant shall conform to all rules and regulations printed hereon or hereafter adopted for the protection of the building or the safety and comfort of all the tenants; said rules and regulations are hereby made a part of this lease. The Landlord and the Tenant shall comply with, and this Lease is subject to, the requirements of the HMC, Administrative Code, Multiple Dwelling Law, and any other Federal or State applicable law, code, rules or regulations. In the event of any conflict between this lease, including any rules incorporated herein, and any applicable law, this Lease shall prevail, to the extent permitted by law. In the event that any part or provision of this Lease is invalid or unenforceable by operation of law or otherwise, the remaining provisions of this lease shall remain in full force and be binding on the parties hereto.”
Familial status discrimination in housing is prohibited under Administrative Code of the City of New York § 8-107 (5), Executive Law § 296, and 42 USC § 3604 (Federal Fair Housing Act). Pursuant to Real Property Law § 235-f (3), “[a]ny . . . rental agreement . . . entered into by one tenant shall be construed to permit occupancy by the tenant,. . . one additional occupant, and dependent children of the occupant. . . .” In this instance, various rules and regulations ban respondent from bringing another adult into the premises as that adult would not fulfill the housing requirements for the building. The court finds that any bar on occupancy of her dependent child would in fact violate the Federal Fair Housing Act as well as the Administrative Code of the City of New York.
Petitioner’s contention that the “housing environment in the building is not supportive of children” is without merit. It must be noted that the court in Sierra specifically forbade the types of assumptions made by petitioner about the effect of the populations found in SRO and supportive housing buildings on children:
“The City’s argument was, in essence, that SRO *1018 buildings are more likely than other apartment buildings to be inhabited by single male households and by those with substance abuse problems and other special needs. While the former is statistically true . . . the conclusion that the presence of such households has a detrimental impact on children is one that could rely only on speculation and on impermissible stereotypes.” (Id. at 548.)
Petitioner’s allegation is particularly unavailing as petitioner provides units in the building to families who receive subsidies from various agencies, for whom it provides supportive services and must guarantee a “wholesome” environment. While it is true that in many instances, occupancy restrictions are enforceable, in this instance there is no specific restriction against housing children in either the building or the premises. Petitioner’s argument that it is entitled to restrict such occupancy is unavailing.
It is well-established that parties may not waive protections or rights that are void as contrary to public policy. (See Vanderhoff v Casler, 91 AD2d 49 [3d Dept 1983] [lease provision requiring tenant to provide written notice to landlord of any dangerous or defective conditions in the premises held void]; see also Fraley Realty Corp. v Stocker, 115 Misc 2d 52 [App Term, 1st Dept 1982] [tenant’s agreement to paint and renovate premises is void as an impermissible attempt by landlord to evade the warranty of habitability].) In this instance, the agreement entered between petitioner and respondent is not only based upon a false presumption, i.e., that the lease, regulatory and contractual agreements bar children from occupying the premises, but also is void as against public policy. Respondent, who was unrepresented by counsel at the time she executed the agreement, cannot be bound to comply with terms which violate her right to fair housing under state or federal law.
Conclusion
A review of the applicable statutes and contracts with governmental entities reveals that none bar children from occupying the premises. None mandate that respondent lose her status as a qualified tenant upon giving birth to a child by virtue of her choice to raise a child in her home. By interpreting provisions of the lease to bar occupancy of the premises by respondent and her infant daughter, petitioner imposes a cruel dilemma. Respondent, who was formerly homeless and is receiving supportive services, must either give up her home as well as *1019 a supportive community or give up her child. Petitioner’s primary purpose is to provide permanent and supportive housing to those who are most vulnerable in our society, including the poor and the homeless, and those living with HIV and AIDS. In the event the court were to grant the relief requested, it would be doing so in contravention of petitioner’s stated goals as well as the Administrative Code of the City of New York and Federal Fair Housing Act.
Based upon the foregoing, petitioner’s motion for summary judgment is denied. Respondent’s motion for summary judgment is granted and the proceeding is dismissed with prejudice.

. “Homeless Tenants” is defined as “persons of low income referred by the City who, prior to their initial occupancy in the premises, resided in emergency shelter facilities operated by or on behalf of the City or are otherwise in need of emergency shelter as determined by the City.”

. “Persons of Low Income” is defined as “individuals whose income (as hereinafter defined) in the calendar year in which their tenancy shall commence shall not exceed sixty percent (60%) of the New York primary metropolitan statistical area median income published by the [HUD] . . . .”